**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

DOROTHY WORKMAN,

       Plaintiff,

v.                                  Case No.: 3:09-cv-00603

MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,

       Defendant.

**MEMORANDUM OPINION**

This action seeks a review of the decision of the Commissioner of the Social Security Administration denying plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (Docket Nos. 11 and 14). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 5 and 6).

The Court has fully considered the evidence and the arguments of counsel. For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.    Introduction

Plaintiff, Dorothy Workman (hereinafter "Claimant"), filed an application for DIB on September 21, 2006, claiming that she had been disabled since January 1, 2001[1]

---

[1] Claimant later amended her disability onset date to October 15, 2001. (Tr. at 155).

due to depression and pain in the knees, back, and shoulders.[2]  (Tr. at 130, 166). The Social Security Administration (SSA) initially denied the claim on December 19, 2006 and, upon reconsideration, again denied it on April 18, 2007. (Tr. at 9).  Thereafter, Claimant filed a written request for a hearing, which was conducted on August 5, 2008 by the Honorable Michelle D. Cavadi, Administrative Law Judge (hereinafter "ALJ"). (Tr. at 18-51).   By decision dated September 18, 2008, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 18-27).  The ALJ's decision became the final decision of the Commissioner on April 8, 2009 when the Appeals Council denied Claimant's request for review. (Tr. at 1-5).  Claimant timely filed the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (Docket No. 2).

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability.  See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972).   A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims.  If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied.  20 C.F.R. §§404.1520, 416.920.  The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment.  *Id.* §§404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the

---

[2] Claimant also filed for Supplemental Security Income, but that application was denied due to income. (Tr. 124-129).

claimant suffers from a severe impairment.  *Id.* §§404.1520(c), 416.920(c).  If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§404.1520(d), 416.920(d).  If the impairment does, then the claimant is found disabled and awarded benefits.  However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity (RFC), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments.  After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§404.1520(e), 416.920(e).  If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.  *Id.* §§404.1520(f), 416.920(f); See also, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983).  The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review."  20 C.F.R. § 404.1520a.  First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable

mental impairment.   If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c).  That section provides as follows:

> c) *Rating the degree of functional limitation.*
>
> (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> 3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation.  A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence, or pace) and "none" in the fourth (episodes of

decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities.   20 C.F.R. § 404.1520a(d)(1).   Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder.  20 C.F.R. § 404.1520a(d)(2).  Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3).   The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusion based on the technique. The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).  The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(2).

In this case, the ALJ determined that plaintiff last met the insured status requirements of the Social Security Act on December 31, 2004.  (Tr. at 11, Finding No. 1).   Therefore, in order to qualify for benefits, Claimant had to establish that she was disabled on or before that date. *Stahl v. Commissionr of Social Security Administration,* 2008 WL 2565895 *4 (N.D.W.Va.), citing *Highland v. Apfel,* 149 F.3d 873 (8th Cir. 1998).

The ALJ found that Claimant satisfied the first step of the sequential evaluation, because she had not engaged in gainful activity since the date of the alleged onset of disability. (Tr. at 11, Finding No. 2).   Turning next to the second step, the ALJ determined that Claimant had the following medically determinable impairments: a hiatal hernia and gastroesophageal/gastrointestinal reflux disease (GERD) with epigastric complaints; hypothyroidism; sinusitis with seasonal allergies and bronchitis; intermittent osteoarthritic pain of the back and knees; hyperlipidemia; TMJ syndrome with left otalgia; and depression.  (Tr. at 11, Finding No. 3)  However, the ALJ concluded that Claimant's impairments, separately and in combination, had not significantly limited her ability to perform basic work-related activities for 12 consecutive months. Accordingly, Claimant did not have a severe impairment or combination of impairments.  (Tr. at 11-17, Finding Nos. 3 and 4).  On this basis, the ALJ found that the plaintiff was not disabled, as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 17, Finding No. 5).

## II.    Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence.   In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo*

review of the evidence.  Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision."  *Blalock v. Richardson, supra* at 775*.*

A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

### III.   Claimant's Background and Relevant Medical Records

Claimant was born in 1952 and was 55 years old at the time of the administrative hearing.  (Tr. at 23).  She had obtained a GED, followed by an Associate's Degree in Business from the Huntington Junior College of Business.  (Tr. at 24).  In the ten years prior to her alleged disability onset date, Claimant worked as a laborer refurbishing homes with fire damage and as a customer service representative for a credit card company.  (Tr. at 25-27, 157-159).  Plaintiff could read, speak, and understand English and do simple mathematics.  (Tr. at 24-25).

The medical evidence considered by the ALJ included records that pre-dated and post-dated the period at issue; that being, October 15, 2001 through December 31, 2004. The Court has reviewed all of the evidence in its entirety, including these medical records, but will only comment on records relevant to the disabilities alleged by Claimant or determined by the ALJ.

### A.      Records that Pre-date October 15, 2001.

In 1993, Claimant presented to the Emergency Department at St. Mary's Medical Center ("SMMC") complaining of left head and eye pain.  (Tr. at 575).  She was diagnosed with migraine headache and sinusitis, treated and released. (*Id.*)

In August 1994, Claimant was admitted to Our Lady of the Lake Regional Medical Center in Baton Rouge, Louisiana after she attempted suicide by taking an overdose of Tylenol. (Tr. at 221-239).  According to the records, Claimant was experiencing discord in her marriage that had exacerbated her long-standing depression and caused her to drive to Louisiana to receive psychiatric treatment near one of her relatives.  When she arrived in Louisiana, she was unable to reach her relative by telephone, so she took the pills.  (*Id.*).  Claimant was hospitalized for a period of fifteen days.  At the time of discharge, Claimant was diagnosed with major depression and prescribed Efexor.  She was instructed to receive outpatient psychotherapy in Huntington.  Her prognosis was fair.  (Tr. at 227).

In 1995, Claimant presented to the Emergency Department at Cabell Huntington Hospital ("CHH") complaining of an earache and tinnitus (ringing in the ear).  She was diagnosed with otitis media, given a prescription, and discharged.  (Tr. at 241-242).

In 1996, Claimant presented to the Emergency Department at CHH on three occasions, twice for bronchitis and once for leg and foot cramps.  (Tr. at 531-543).  On each occasion, she was evaluated, given medication, and discharged.

She next returned to the CHH Emergency Department in March 1998, with low back pain that had started five days earlier.  She described the pain as localized to her lumbar spine and denied any injury-producing event. (Tr. at 346-347).  She was diagnosed with "back syndrome" and muscle spasm.  The physician prescribed Flexoril and Naprosyn and discharged Claimant.  (*Id.*).

Four months later, Claimant returned to the Emergency Department complaining of a severe headache and heartburn.  (Tr. at 523).  She was diagnosed with GERD and cephalgia, given medication, and instructed to see her family physician in 3

days, or return if the symptoms worsened.   (Tr. at 524). Claimant did not return to the Emergency Department until September 1999.  At that time, she was complaining of bronchitis and sinusitis.  (Tr. at 338-341).  Once again, she was treated and released. (*Id.*).

Also in 1999, Claimant saw Dr. Richard Mailloux at Huntington Internal Medicine Group ("HIMG") after she became concerned that she might have colorectal cancer.  Claimant had experienced some episodes of rectal bleeding, perianal discomfort, and dull, non-radiating left-sided abdominal pain. (Tr. at 586-587).  After examining Claimant, Dr. Mailloux diagnosed hemorrhoids and left sided abdominal pain of uncertain etiology. (*Id.*).

In May 2000, Claimant returned to the Emergency Department at CHH with complaints of a three day headache accompanied by mild nausea and photophobia. (Tr. at 296-298).  She also complained of having experienced leg cramps the day before that had improved, but worsened with walking.  She was diagnosed with a sinus headache and instructed to take Ibuprofen as needed. *(Id.)*.

In May 2001, Claimant went to the Emergency Department at SMMC after she developed chest pains that radiated into her left shoulder.  (Tr. at 282-288).   She was admitted and referred to University Physicians and Surgeons to rule out a myocardial infarction.  (*Id.*).  Dr. Rosa Solis performed an examination on Claimant, noting that her past medical history included depression, hypothyroidism, and status post hysterectomy.  No findings were made regarding musculoskeletal problems.  (*Id.*).  Dr. Solis' assessment was to rule out myocardial infarction and consider gastrointestinal sources for the symptoms, such as gastritis, reflux disease, and peptic ulcer.  (*Id.*).  The

following day, Claimant underwent a myocardial perfusion stress study that was essentially normal. (Tr. at 288).

**B.** **Records Generated Between October 2001 and December 31, 2004.**

Claimant saw Dr. Richard Mailloux again in March 2002 for a repeat colonoscopy to rule out polyps and colorectal cancer. (Tr. at 584). Once again, Dr. Mailloux found hemorrhoids and also found a small colonic polyp that he excised. (*Id.*)

In October 2003, Claimant saw Dr. Anita Dawson for sinusitis, allergies and otitis media. (Tr. at 292). While Dr. Dawson's medical records are virtually indecipherable, the record confirms that the "decision complexity" of this visit was "minor."[3]

On December 3, 2003, Claimant began seeing the health care providers at Dr. Saxe and Harris Medical Associates in Barboursville, West Virginia ("Dr. Saxe's office"). (Tr. at 356-415). These records provide significant information regarding Claimant's medical history and condition. On December 3, 2003, Claimant told the certified family nurse practitioner, Tammy King, that she had come to the office to "establish care." (Tr. at 415-416). At that time, she was suffering from a cold. She told Nurse King that she had a history of hypothyroidism, mild depression, elevated lipids and GERD. (*Id.*). When asked about her musculoskeletal system, she stated that she had "painful joints, back pain" and "bursitis of her left shoulder." (*Id.*). Nurse King diagnosed persistent upper respiratory infection; heart murmur; hypothyroidism; depression; GERD; and lipids. She did not diagnose any musculoskeletal condition. (*Id.*).

---

[3] The Court notes that this record was supplied in response to a request by the SSA on October 4, 2006. The SSA requested additional records from Dr. Dawson on March 6, 2007 and received the records marked and identified as Exhibit 11F. (Tr. at 427-434). Unfortunately, the records supplied by Dr. Dawson's office in 2007 pertained to a patient other than Claimant. For that reason, the Court did not consider Exhibit 11F in reaching its decision in this case.

In 2004, Claimant visited Dr. Saxe's office on seven occasions for a variety of medical ailments, including osteoarthritis; earache; upper respiratory infections; epigastric, abdominal, and low back pain; and fatigue.  (Tr. at 407-414).  Except for a visit in August 2004, when she complained of severe epigastric pain, Claimant was generally noted to be alert, oriented and in no acute distress at these visits  (*Id.*).  In March 2004, Dr. Saxe referred Claimant to Dr. Philip Stevens, an otolaryngologist, for a one month history of left otalgia (earache).  (Tr. at 394-395).  Dr. Stevens performed a complete physical examination of the Claimant's ears, nose, and throat.   The examination was entirely normal except for some left jaw tenderness.   Dr. Stevens diagnosed left otalgia secondary to TMJ syndrome and prescribed Ibuprofen.  (*Id.*).   In July 2004, Dr. Saxe's office sent Claimant to SMMC to undergo a CT scan of the abdomen and pelvis.  (Tr. at 386).  This scan revealed a small adrenal mass and a normal pelvis. (*Id.*).  In August 2004, Dr. Saxe ordered a HIDA scan to help diagnose Claimant's right upper quadrant pain. (Tr. at 387).  The radiologist reported a normal HIDA scan with normal gallbladder ejection fraction. (*Id.*). In November 2004, the certified family nurse practitioner, Suzanne Celdran, referred Claimant to Dr. Richard Mailloux for an endoscopy in another effort to find the cause of her epigastric pain. (*Id.*).  Dr. Mailloux performed an esophagogastroduodenoscopy ("EGD") to examine the upper gastrointestinal tract, including the esophagus, stomach and upper duodenum. (Tr. at 392-393).  Other than a hiatal hernia, Dr. Mailloux found no abnormalities.  He also noted that Claimant's reflux appeared to be well controlled.  (*Id.*).

### C.      Records that Post-date December 31, 2004.

On January 27, 2005, Claimant presented to the Emergency Department at CHH complaining of dysuria, hematuria, nausea, and vomiting.  (Tr. at 307-315).  On physical

examination, Claimant's vital signs, general appearance, psychiatric state, musculoskeletal, gastrointestinal, and genitourinary systems were all noted to be normal.  (Tr. at 311).  She was diagnosed with a urinary tract infection and discharged on antibiotics.  (Tr. at 315).

Claimant saw the providers at Dr. Saxe's office on five occasions in 2005.  (Tr. 402-406).  She was treated for bronchitis, sinusitis, anxiety, otitis, irritable bowel, and rhinitis.  Her primary problem that year seemed to be with earaches.  (*Id.*).  In August 2005, Dr. Saxe ordered another HIDA scan and a right upper quadrant ultrasound.  (Tr. at 381-382).  The HIDA scan was unremarkable, and the ultrasound revealed a normal gallbladder, liver and pancreas.  (*Id.*)  In October 2005, Dr. Saxe referred Claimant to Dr. James Morgan, a surgeon with HIMG, to evaluate Claimant's continued complaints of abdominal pain.  (Tr. at 389-390).  Dr. Morgan reviewed her history and performed an examination.  He concluded that Claimant's abdominal pain had an unclear etiology, although it did not appear to be related to biliary tract disease.  Accordingly, he made an empiric diagnosis of irritable bowel syndrome. (*Id.*).  Dr. Morgan prescribed Zelnorm. (*Id.*).

In 2006, Claimant had seven appointments with the providers at Dr. Saxe's office. (Tr. at 396-401, 475).  In January 2006, she was seen for surgical clearance before cataract surgery.  (Tr. at 401).   Dr. Saxe performed a physical examination that was essentially normal.   His impression was cataracts, tobacco abuse, depression, hypothyroidism, GERD and irritable colon.  Claimant was cleared for the procedure. (*Id.*).   On August 10, 2006, Claimant complained of pain in her upper back and bilaterally in her legs.  (Tr. at 397).  She told the nurse practitioner that "she's had the pain for a long time but it is exacerbating."  (*Id.*).  She stated that she could not do

housework, because the pain was continuous and unrelenting.  The nurse practitioner ordered an x-ray of the thoracic spine.  Claimant returned on August 28, 2008 for follow-up care.  (Tr. at 396).  In the interim, Claimant had an MRI of her thoracic spine that showed degenerative changes in the dorsal spine[4] with minimal to mild wedging in two vertebra.  There was no stenosis or disc herniation. (*Id.*).  The MRI report confirmed that the degenerative changes were mild in severity and commented on a bulging disc at the T8-T9 level and one at the T2-T3 level, both without stenosis.  (Tr. at 350).  Claimant's lab work revealed an elevated rheumatoid factor.  The nurse practitioner diagnosed rheumatoid arthritis and referred claimant for physical therapy.  She prescribed Celebrex, Zanaflex and Lorcet.  (*Id.*).

On September 6, 2006, Claimant began seeing Dr. Brett Short, a chiropractor. (Tr. 417-426).  She told Dr. Short that she had experienced issues with her back for years, that the onset was slow and insidious, and that her symptoms had gotten progressively worse over time. (Tr. at 420).  On September 11, 2006, Dr. Short wrote to Dr. Saxe, indicating that Claimant had thoracic radiculitis secondary to degenerative disc disease and multiple levels of bulging discs.  (Tr. at 388).  He felt strongly that Claimant would respond favorably to chiropractic treatment.  (*Id.*).  Claimant received regular manipulations for slightly over one month.  (*Id.*).  When she returned to Dr. Saxe's office in October, 2006, she did not complain of back pain.  (Tr. at 475).  At her last chiropractic visit in late October, she appeared to have improved. (Tr. at 464).

In December 2006, the SSA obtained a physical residual functional capacity assessment completed by Dr. Michael L. Mick and a psychiatric review completed by Joseph Kuznair, Ed.D.  (Tr. at 439-460).  Both reviewers indicated that there was

---

[4] The term "dorsal spine" is often used interchangeably with the term "thoracic spine."

insufficient evidence to assess Claimant's function on the date that she was last insured. (*Id.*). The SSA requested additional medical records from Claimant's treating physicians and then, in March and April, 2007, obtained supplemental reviews from Dr. Rogelio Lim and Dr. Elizabeth Adams. (Tr. at 476-485). Once again, the reviewers noted that the records were insufficient to evaluate Claimant's residual functional capacity as of December 31, 2004. (*Id.*). Dr. James Binder likewise was unable to evaluate Claimant's psychiatric condition due to insufficient evidence. (Tr. at 486-496).

In March 2008, Claimant consulted with Dr. Mauricio Saleme upon a referral by Dr. Saxe. (Tr. 545- 563) Dr. Saleme evaluated Claimant for complaints of heartburn, constipation, dark stools and history of colonic polyps. (*Id.*). He performed an endoscopy, EGD, and colonoscopy, which confirmed the existence of a hiatal hernia, GERD, and mild chronic gastritis. (*Id.*). He recommended a low fat diet and told Claimant to continue her medications. (*Id.*).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision was not supported by substantial evidence. She argues that the ALJ (1) failed to fully and fairly develop the record, (2) failed to recognize the severity of Claimant's impairments when considered in combination, and (3) performed a "faulty credibility assessment" on the Claimant. (Pl. Br. at 6-9).

In response, the Commissioner contends that the evidence was sufficient for the ALJ to make a determination as to Claimant's alleged disability, and the ALJ correctly concluded that Claimant did not have a severe impairment during the relevant time period, even when viewing all of her medical conditions in combination. In addition,

the Commissioner argues that Claimant's complaints were not supported by substantial evidence; therefore, her credibility was questionable.  (Def. Br. at 7-13).

## V.     Analysis

After considering each of these arguments, the Court finds that the Commissioner's decision is supported by substantial evidence for the following reasons:

1. The record was as complete as possible.  Consequently, the ALJ had sufficient evidence upon which to make a determination in this case.

2. The medical documentation does not support the conclusion that an impairment or impairments existed between October 15, 2001 and December 31, 2004, separately or in combination, that significantly limited Claimant's ability to engage in basic work activities; and

3. The ALJ's assessment of Claimant's credibility is reasonable in view of the medical evidence.

### A.     Duty of Develop Record

Claimant's contention that the ALJ did not fully develop the record appears to rest on two foundations.[5]  First, Claimant argues that the finding of "insufficient evidence" by all of the agency reviewers is proof that the record was undeveloped and should have triggered the ALJ to order a consultative examination.  (Pl. Br. at 7). Second, Claimant avers that she "did not have the ability to seek routine medical care in the late 1990's and early 2000's" and "did not have the resources to seek continuing care" after her hospitalization for depression in 1994.  (*Id.*).  Therefore, the absence of supporting records should not be considered as evidence that her impairments were non-severe.  The Court finds neither of these arguments to be persuasive.

While the ALJ had the duty to fully and fairly develop the record, she was not required to act as Claimant's counsel. *Clark v. Shalala,* 28 F.3d 828 (8th Cir. 1994).  The

---

[5] Claimant also argues that the ALJ did not properly extrapolate from Claimant's current treatment records to find that her impairments had been long-standing in nature and pre-dated her last insured date.  However, that argument is inapposite to the claim that the ALJ failed to develop the record.

ALJ had the right to assume that Claimant's counsel was presenting Claimant's strongest case for benefits. *Nichols v. Astrue,* 2009 WL 2512417 *4 (7th Cir. 2009), citing *Glenn v. Sec'y of Health and Human Servs.,* 814 F.2d 387,391 (7th Cir. 1987). Moreover, the ALJ's duty to develop the record did not mandate that she order a consultative examination "as long as the record contain[ed] sufficient evidence for the administrative law judge to make an informed decision." *Ingram v. Commissioner of Social security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); See also, *Weise v. Astrue,* 2009 WL 3248086 (S.D.W.Va.).   When considering the adequacy of the record, the Court must look for evidentiary gaps that result in "unfairness or clear prejudice" to the claimant.  *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995). A remand is not warranted every time a claimant alleges that the ALJ failed to fully develop the record. Instead, remand is appropriate when the absence of available documentation creates the likelihood of unfair prejudice to the claimant.  (*Id.*)

In this case, the ALJ had detailed records of examinations, assessments, consultations, laboratory and radiological studies created by or at the request of Dr. Saxe's medical office that spanned the period from December 2003 through March 2008.  These records provided substantial evidence of the status of Claimant's medical conditions as they existed during the year before December 31, 2004, the date upon which she was last insured.  Similarly, the records documenting Claimant's conditions from 1993 through 2003, while not voluminous, provided informative, periodic snapshots of Claimant's overall health status.  The picture painted by the older records was consistent with the picture painted by the more recent records, so that the story of Claimant's health flowed logically from one year to the next. The Court does not find any glaring evidentiary gaps that, if filled, would realistically change the assessment of

Claimant impairments as they existed between October 15, 2001 and December 21, 2004.[6]

The ALJ provided a thorough explanation for her conclusions, pointing to the medical records as well as the application and testimony of the Claimant.  (Tr. at 11-17).  The ALJ clarified that while she found that Claimant suffered from medically determinable impairments, the records did not establish sufficient severity of the impairments to hinder Claimant's ability to engage in gainful activity.  For example, the ALJ discussed the severity of Claimant's knee and back pain, indicating that while she had suffered intermittent bouts of discomfort, none of the testing performed prior to December 31, 2004 demonstrated a significant abnormality.  (Tr. at 12).  However, subsequently, and consistent with Claimant's testimony at the administrative hearing, the records reflect that an acute exacerbation of Claimant's back pain occurred in 2006, and again in 2008, ultimately resulting in surgery in March 2008.  (*Id.*).  Unfortunately, neither of these exacerbations correlates to the condition of Claimant's back in 2001 through 2004.

Similarly, the ALJ examined the course of Claimant's depression.  (Tr. at 12, 16-17).  She noted that Claimant had been hospitalized in 1994 for suicidal ideations arising from martial discord, but had not experienced any similar episodes since that date.  While Claimant continued to suffer from depression, she was generally described in the medical records from Dr. Saxe's office as "fully oriented, calm and show[ing] no signs of anxiety, nervousness or distress."   (Tr. at 16).  The ALJ properly applied the special

_____

[6] The absence of a complete set of Dr. Dawson's records does not constitute a prejudicial evidentiary gap, because the other available records sufficiently fill in any gap.  In addition, the detailed history taken at Dr. Saxe's office and the thorough evaluations performed in 2004 provide substantial evidence that Claimant did not suffer any undocumented, severe impairment between 2001 and 2004.

technique required in cases of alleged mental impairment and concluded that Claimant's mental impairment was not severe.  (Tr. at 16-17).

Claimant's argument that a finding of "insufficient evidence" by the non-examining sources mandated a consultative examination is equally without merit. Claimant offers no case law, regulation, or Social Security Administration Ruling to support this position.  As the Commissioner points out, Claimant did not file her application for benefits until nearly two years after her DIB insured status had expired. (Def. Br. at 11).  The medical records demonstrate that in 2005 and 2006 Claimant began to complain of more intense back pain and of additional medical issues. Accordingly, an evaluation of Claimant performed in late 2006 or early 2007 would not have fairly represented her physical and mental condition in the years between 2001 and 2004.

Claimant had the ultimate responsibility to prove that she was disabled prior to expiration of her insured status.  20 C.F.R. §404.1512(a) and §416.912(a); See also *Stahl v. Commissionr of Social Security Administration,* 2008 WL 2565895 *4 (N.D.W.Va.), citing *Highland v. Apfel,* 149 F,3d 873 (8th Cir. 1998).  As the United States Supreme Court noted in *Bowen v. Yuckert,* 482 U.S. 137, 146 (1987), "the severity regulation does not change the settled allocation of burdens of proof in disability proceedings. . .the claimant first must bear the burden. . .of showing that. . he has a medically severe impairment or combination of impairments. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so."  In this case, the sequential process ended at step two, because Claimant could not show that she suffered from a severe impairment prior to December 31, 2004.  The SSA clearly made every effort to collect the records from Claimant's

identified treating sources.   The fact that records may not exist, because Claimant could not afford treatment, is irrelevant.   When the evidence from the pertinent time frame is inadequate to assess function primarily because the evidence does not exist and never existed, Claimant is hard-pressed to put forward a persuasive argument that the ALJ is responsible for that lack of evidence.

**B.    The ALJ Failed to Consider the Combined Effect of Claimant's Impairments.**

Claimant's allegation that the ALJ did not consider the combined effect of her medically determinable impairments ignores the written decision of the ALJ.   In that decision, the ALJ carefully considered the objective medical evidence and both the written and oral statements of Claimant regarding the overall impact of her physical and mental limitations.  (Tr. at 13-17).   In determining whether a claimant's impairment or impairments are of sufficient severity to render the claimant disabled under the Social Security Act, the ALJ must consider the synergistic or combined effect of all of claimant's impairments without regard to whether the impairments, considered separately, would be of such severity.   42 U.S.C. 423(d)(2)(B).   "It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render a claimant unable to engage in substantial gainful activity."   *Walker v. Bowen,* 889 F.2d 47, 49-50 (4th Cir. 1989).   The Court must look at the written decision to ascertain whether the ALJ considered the synergistic effect of all of Claimant's impairments.   The standard of review is not a *de novo* consideration of the effect of the combined impairments. Rather, the Court must simply confirm that the analysis was performed and that the ultimate finding was supported by substantial evidence.

In this case, the ALJ clearly conducted the analysis, considering each alleged or established impairment, separately, and then as a whole.   The ALJ explained her assessment of Claimant's credibility, comparing the statements made by Claimant to the medical documentation and noting the inconsistencies. (*Id.*).   Claimant argues that the ALJ failed to factor in the effects of her rheumatoid arthritis and mental impairment. To the contrary, the ALJ specifically noted that Claimant's diagnosis of rheumatoid arthritis was made in 2005, after the time frame at issue, and her mental status in the years between 2001 and 2004 was stable.   She concluded that Claimant did not have mental or physical impairments that caused anymore than minimal interference with her ability to function.   The Court finds this conclusion to be supported by substantial evidence.

### C.      The ALJ's Credibility Determination

The ALJ correctly stated her obligation in assessing Claimant's symptoms to determine the severity of her impairments.   (Tr. at 13).   Once the ALJ found the existence of medically determinable impairments that could reasonably be expected to produce Claimant's pain and other symptoms, the ALJ was required to evaluate the intensity, persistence, and functional limitations caused by the impairments. *SSR 96-7p*. When a claimant's statements about intensity, persistence or functional limitations are not substantiated by objective medical evidence, the adjudicator must make a credibility determination. (*Id.*).   A credibility determination is an assessment of the degree to which the claimant's statements "can be believed and accepted as true."   (*Id.*).   This assessment is made by considering the entire case record and cannot be based on an intangible or intuitive notion about an individual's credibility.   (*Id.*).   The adjudicator must evaluate the medical signs and findings; the diagnosis and prognosis; the medical

opinions; statements and reports from the claimant, claimant's physicians, or other persons with knowledge of the claimant's history, symptoms, treatment, response to treatment, work record and daily activities; observations by SSA employees who interviewed the claimant; and the adjudicator's own observations made during the administrative hearing.  (*Id.*).   Once the ALJ made a credibility determination, she was obligated to document the reasons for her findings in a manner sufficiently specific to allow subsequent reviewers to understand the weight given to the claimant's statements and the reasons for that weight.   (*Id.*).

The Court finds that the ALJ in this case fulfilled her responsibilities in assessing Claimant's credibility and documenting the weight given to Claimant's statements.  The ALJ explained that Claimant's conclusory statements regarding her functional limitations were markedly inconsistent with her own description of her daily activities and with the findings and notations in the medical records.  (Tr. at 15-16).   In addition, the ALJ noted that none of the medical conditions about which Claimant currently complains "were present at a level of intensity or severity as to cause more than minimal interference in her functioning at any time prior to her date last insured."  (Tr. at 16). The ALJ concluded that Claimant's ability to demarcate between her conditions as they existed in 2001 through 2004 and her conditions at the time of the hearing was not well formed.

"In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, make determinations as to credibility, or substitute its own judgment for that of the Commissioner."  See *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these

questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976). The Court finds that the record contains substantial evidence to support the conclusions of the ALJ on the issue of credibility; therefore, this argument is without merit.

## V.      Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** December 1, 2010.

Cheryl A.  Eifert
United States Magistrate Judge